1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLIN R. BRICKMAN,

          Plaintiff,

    v.

FACEBOOK, INC.,

          Defendant.

Case No.  16-cv-00751-TEH

**ORDER DENYING FACEBOOK'S MOTION TO DISMISS**

On August 9, 2016, Facebook filed a motion to dismiss Brickman's First Amended Complaint ("FAC") under Fed. R. Civ. P. 12(b)(6).  ECF No. 50.  Pursuant to Fed. R. Civ. P. 5.1, Facebook also filed a Notice of Constitutional Question to the Attorney General of the United States.  ECF No. 51.  And pursuant to Fed. R. Civ. P. 5.1(c), the United States intervened in the case for the limited purpose of defending the constitutionality of the TCPA.  ECF No. 62.  Brickman and the United States timely opposed Facebook's motion to dismiss, ECF Nos. 55, 63; and Facebook timely replied.  ECF No. 64.  On September 11, 2016, the Court requested supplemental briefing from both Brickman and Facebook addressing whether the TCPA and its exceptions would pass strict scrutiny.  *See* ECF No. 68.  Both parties submitted supplemental briefing.  ECF Nos. 71–72.  A hearing was held on Facebook's motion on January 23, 2017.  After carefully considering the parties' written and oral arguments, the Court DENIES Facebook's motion for the reasons set forth below.

**I. BACKGROUND**

The following factual allegations are taken from Plaintiff Brickman's First Amended Complaint ("FAC"), unless otherwise stated, and are therefore accepted as true for the purposes of this motion.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

1     Defendant Facebook, Inc. ("Facebook") owns and operates the online social

2  networking service, www.facebook.com.  ECF No. 43. ("FAC") ¶ 5.  There are more than

3  156 million Facebook users in the United States, and more than 2 billion worldwide.  *Id.*

4  While Facebook does not own factories, physical product inventory, or saleable goods, it

5  generates revenue from the activities of Facebook users.  *Id.* ¶ 19.  In fact, in its investment

6  publications, Facebook defines each time a user engages on the Facebook platform as a

7  "revenue-generating activity."  *Id.* ¶ 20.  In an effort to increase user traffic, which in turn

8  drives Facebook's advertising revenue, Facebook sent out "Birthday Announcements

9  Texts" to cell phones of Facebook users inviting them to engage with the Facebook

10 platform.  *Id.* ¶ 5.

11     Facebook employed computer software to send Birthday Announcement Texts to

12 users.  *Id.* ¶ 67.  Facebook's computer system, without any human intervention, reviews

13 user data on a daily basis to identify users who have birthdays on a particular day;

14 identifies the user's Facebook friends who will receive the Birthday Text Announcement

15 Texts for a particular user's birthday;  identifies the phone numbers of the Facebook

16 friends that will receive the message; automatically inserts the name of the user celebrating

17 a birthday into a form text in the appropriate language for each of the user's Facebook

18 friends, creates the Birthday Announcement Text; compiles a list of cell phone numbers to

19 which it will send Birthday Text Announcements, stores those cell phone numbers in a

20 queue, and then sends the text messages from that queue.  *Id.* ¶¶ 66–73.

21     On or about December 15, 2015, Facebook, through its short code SMS number

22 32665033, texted Brickman's cell phone number an unsolicited Birthday Announcement

23 Text stating "Today is Jim Stewart's birthday. Reply to post a wish on his Timeline or

24 reply with 1 to post 'Happy Birthday!'".  *Id.* ¶ 84.  Although Brickman supplied Facebook

25 his cell phone number, which is associated to his Facebook page, Brickman indicated in

26 the Notification Settings of his Facebook account, prior to receiving the text message, that

27 he did not want to receive any text messages from Facebook, and also did not activate text

28 messaging for his cell phone.  ¶¶ 2, 36, 79–82, 85.  On February 2, 2016, Brickman filed a

United States District Court
Northern District of California

2

1   putative class action suit against Facebook, alleging that Facebook violates the Telephone

2   Consumer Protection Act ("TCPA") by sending unauthorized text messages.  ECF No. 1.

3   He seeks to represent the following class: "All individuals who received one or more

4   Birthday Announcement Texts from Defendant to a cell phone through the use of an

5   automated telephone dialing system at any time without their consent."  FAC ¶ 97.

6   **II. LEGAL STANDARD**

7       Dismissal is appropriate under Fed. R. Civ. P. 12(b)(6) when a plaintiff's

8   allegations fail to "state a claim upon which relief can be granted."  Fed R. Civ. P.

9   12(b)(6).  Specifically, a plaintiff must plead "enough facts to state a claim to relief that is

10  plausible on its face." *Twombly,* 550 U.S. at 570.  "The plausibility standard is not akin to

11  a 'probability requirement,' but it asks for more than a sheer possibility that a defendant

12  has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial

13  plausibility when the plaintiff pleads factual content that allows the court to draw the

14  reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

15      In ruling on a motion to dismiss, a court must "accept all material allegations of fact

16  as true and construe the complaint in a light most favorable to the non-moving party."

17  *Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).  Courts are not "bound to accept

18  as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citation

19  omitted).  Dismissal of claims that fail to meet this standard should be with leave to

20  amend, unless it is clear that amendment could not possibly cure the complaint's

21  deficiencies. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).

22  **III. DISCUSSION**

23      1. **Brickman has Sufficiently Alleged a Violation of the TCPA.**

24      A valid TCPA claim requires plaintiff to allege (1) Defendant called a cellular

25  telephone number; (2) using an automated telephone dialing system ("ATDS"); and (3)

26  without the recipient's prior express consent. *Meyer v. Portfolio Recovery Assocs.*, 707

27  F.3d 1036, 1043 (9th Cir. 2012).  A text message is a "call" within the meaning of the

28  TCPA. *Sutterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).  The

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    TCPA defines an automated telephone dialing system as "equipment which has the

2    capacity to store or produce telephone numbers to be called, using a random or sequential

3    number generator; and to dial such numbers."  47 U.S.C. § 227(a)(1).  The Ninth Circuit

4    has determined this meaning to be "clear and unambiguous," *Satterfield*, 569 F.3d at 951,

5    and has clarified that in analyzing whether a device is an ATDS the Court's "focus must be

6    on whether the equipment has the *capacity* to store or produce telephone numbers to be

7    called, using a random or sequential number generator." *Meyer*, 707 F.3d at 1043.

8    Therefore, "a system need not actually store, produce, or call randomly or sequentially

9    generated telephone numbers; it need only have the capacity to do it." *Id.* (quoting

10   *Satterfield*, 569 F.3d at 951).

11           Additionally, pursuant to its authority to "prescribe regulations to implement the

12   requirements" of the Act's prohibitions, 47 U.S.C. § 227(b)(2), the Federal

13   Communications Commission ("FCC") has issued a number of declaratory rulings on

14   whether particular equipment qualifies as an ATDS.  For example, the FCC has stated the

15   basic functions of an ATDS are to "dial numbers without human intervention" and to "dial

16   thousands of numbers in a short period of time," *In re Matter of Rules and Regulations*

17   *Implementing the Telephone Consumer Protection Act of 1991,* 30 FCC Rcd. 7961, 7975

18   (2015) ("2015 FCC Order"), and has also clarified that the ATDS definition "covers any

19   equipment that has the specified *capacity* to generate numbers and dial them without

20   human intervention regardless of whether the numbers called are randomly or sequentially

21   generated or come from calling lists." *In the Matter of Rules and Regulations*

22   *Implementing the Telephone Consumer Protection Act of 1991,* 27 FCC Rcd. 15391,

23   15392 n. 5 (2012) (emphasis in original) ("2012 FCC Order").  Moreover, the FCC has

24   clarified that "[h]ow the human intervention element applies to a particular piece of

25   equipment is specific to each individual piece of equipment, based on how the equipment

26   functions and depends on human intervention, and is therefore a case-by-case

27   determination." 2015 FCC Order, at 7975.  "This [C]ourt is bound by the FCC's

28   interpretations of the TCPA, unless those interpretations are invalidated by a court of

4

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

appeals". *Reardon v. Uber Technologies, Inc.*, 115 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015) (citing 28 U.S.C. § 2342 *et seq.* and *Pac. Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003)).

Here, Brickman alleges that Facebook employs computer software to send "Birthday Announcement Texts" without human intervention to users.  FAC ¶ 67.  More specifically, Brickman alleges Facebook's computer system, without any human intervention, reviews user data on a daily basis to identify users who have birthdays on a particular day; identifies the users' Facebook friends who will receive the Birthday Text Announcement Texts for a particular user's birthday;  identifies the cell phone numbers of the Facebook friends that will receive the message; automatically inserts the name of the user celebrating a birthday into a form text in the appropriate language for each of the user's Facebook friends, creates the Birthday Announcement Text; compiles a list of cell phone numbers to which it will send Birthday Text Announcements, stores those cell phone numbers in a queue, and then causes the text messages to be sent from that queue. *Id.* ¶¶ 66–73.  Brickman argues the alleged computer system is an ATDS because such a system has the capacity to store and dial telephone numbers without human intervention; and also because the system has the capacity to store or produce telephone numbers using a random or sequential number generator, and to dial telephone numbers without human intervention. *Id.* ¶¶ 74–75.

In contrast, Facebook contends Brickman has not sufficiently alleged a TCPA claim because the content of the birthday message and the context of the alleged birthday message, along with the absence of other messages, supports a finding that the text was the result of direct targeting following human intervention.  ECF No. 50 ("Mot.") at 8:7–10. In support of this, Defendants rely heavily on *Duguid v. Facebook, Inc.*, No. 15-cv-00985-JST, 2016 WL 1169365, at \*5 (N.D. Cal. Mar. 24, 2016), where the court examined whether a plaintiff had plausibly alleged a violation of the TCPA.  The plaintiff there alleged that although he never provided his cell phone number to Facebook nor did he authorize it to send him messages, he had received text messages from an SMS short code

1    licensed to and operated by Facebook, using the following template: "Your Facebook

2    account was accessed from [internet browser] at [time].  Log in for more info."  *Id.* at \*1.

3    The plaintiff also made a conclusory allegation that the text messages "were made with an

4    ATDS" and that the "ATDS has the capacity to store or produce telephone numbers to be

5    called, using a random or sequential number generator."  *Id.*  In determining whether the

6    plaintiff's conclusory allegation supported a claim for relief under the TCPA, the court

7    analyzed "the content of the message, the context in which it was received, and the

8    existence of similar messages."  *Id.* at \*5.  In doing so, the court dismissed the plaintiff's

9    TCPA claim because his "allegations suggest[ed] that Facebook's login notification

10   messages [were] targeted to specific phone numbers and [were] triggered by attempts to

11   log in to Facebook accounts associated with those phone numbers."  *Id.*

12          Facebook argues that *Duguid* warrants the same outcome here.  First, Facebook

13   argues the content of the message shows the text message was specifically targeted to

14   Brickman because it identified a specific individual, with a specific connection to plaintiff,

15   relating to a specific event on a specific date.  Mot. at 9:23–27.  And while Brickman

16   alleges the use of a fill-in-the-blank template, Facebook argues such a template is strong

17   evidence of the sort of specific targeting inconsistent with the use an ATDS.  *Id*. at 9:27–

18   10:3.  Second, in regard to the context of the message, Facebook argues the message does

19   not suggest a generic marketing message that was sent en masse with an ATDS.  Mot. at

20   10:17-18.  Again, this is because Facebook's message was geared to a particular plaintiff

21   about a particular event and because it was not a telemarketing advertisement.  Mot. at 18–

22   24.  Lastly, Facebook argues that because Brickman received the birthday text only once,

23   the message is fully consistent with direct targeting and cuts against a finding that

24   Facebook used an ATDS.  Mot. at 2–5.

25          While the call is certainly a close one, viewing Brickman's allegations in the light

26   most favorable to him, this Court finds he has alleged enough to support a TCPA claim

27   against Facebook.  First, in contrast to the plaintiff in *Duguid*, here, Brickman has alleged

28   more than a conclusory allegation that Facebook used an ATDS to send out text messages

United States District Court
Northern District of California

United States District Court
Northern District of California

1    – he has alleged exactly how Facebook's software determines who to text, how it gathers

2    the contact information needed to send out texts, how it creates text messages, and how it

3    sends them out, all without human intervention.  Such equipment falls within the FCC's

4    definition of an ATDS, as the alleged equipment would have the "capacity to generate

5    numbers and dial them without human intervention" even if the numbers came from a

6    calling list.  *See* 2015 FCC Order, at 8077.  Second, here, peripheral considerations such as

7    the content of Facebook's text message, the context of the Facebook's text message, and

8    the existence of similar messages do not preclude a finding that Facebook employed an

9    ATDS to send out the Birthday Announcement Texts.  While Facebook's Birthday

10   Announcement Texts do suggest direct targeting of Brickman, based on the facts alleged it

11   is plausible that Facebook could have used an ATDS to send out the targeted messages.

12   This is especially true in a situation like this where Brickman alleges Facebook possessed

13   the particular information and technology needed to craft such targeted messages (i.e., cell

14   phone numbers, users' birthdays, friendship connections, etc.).[1]  *See* FAC ¶ 67.

15        Facebook also attempts to strike down Brickman's TCPA claim by arguing it was

16   triggered by human intervention.  Mot. at 12–14.  Facebook argues the Birthday

17   Announcement Text was triggered by human intervention because the following steps

18   were taken: Brickman signed up for Facebook; linked his cell phone number to his profile;

19   befriended Mr. Stewart on Facebook, who himself entered his birth date; and then decided

20   to share that date with his Facebook friends.  Mot. at 13:18–25.  As mentioned above,

21   whether human intervention exists is a case-by-case determination that requires the Court

22   to analyze "how the equipment functions and depends on human intervention."  2015 FCC

23   Order, at 7975.   In other words, the FCC requires the Court to determine to what extent

24   human intervention is the impetus for the transmission of the challenged message.

25

26   [1] Facebook also cited to several other cases supporting its "content, context, and similar
     messages" argument, *see, e.g., Flores v. Adir Int'l, LLC*, No. CV 15-00076-AB, 2015 WL
27   4340020 (C.D. Cal. July 15, 2015) and *Weisberg v. Stripe, Inc.*, No. 16-cv-00584-JST,
     2016 WL 3971296 (N.D. Cal. July 25, 2016), but these cases are distinguishable.  Unlike
28   the plaintiffs in these cases, Brickman has alleged, in sufficient detail, how Facebook's
     software operates as an ATDS.

1    *Sherman v. Yahoo! Inc.*, 150 F. Supp. 3d 1213, 1217 (S.D. Cal. 2015).   Considering the

2    allegations put forth in Brickman's FAC and viewing them in the light most favorable to

3    him, the Court finds that Brickman's and Mr. Stewart's actions were not the impetus for

4    Facebook sending the Birthday Announcement Text.  This is particularly true where

5    Brickman alleges he gave Facebook his cell phone number but that his account settings

6    gave Facebook "unambiguous notice" that it did not have consent to send him text

7    messages.  FAC ¶¶ 2, 78.  Also, the FCC has stated equipment may be considered an

8    ATDS regardless of whether the numbers come from a calling list.  2015 FCC Order, at

9    8077.  This FCC interpretation would mean nothing if merely adding phone numbers to a

10   calling list – which would always undoubtedly require some human conduct – was deemed

11   to constitute "human intervention."  This is not a situation like *Weisberg*, 2016 WL

12   3971296, or *Cours v. Life360, Inc.*, No. 16-cv-00805-THE, 2016 WL 4039279 (N.D. Cal.

13   July 28, 2016), where automated messages were *directly* triggered by an individual's

14   affirmative acts inviting such communications.  Simply stated, this Court agrees with other

15   courts which have determined that because a person will always be a but-for cause of any

16   action's machine, "human intervention" for purposes of the TCPA requires more than but-

17   for causation.  *Sherman,*150 F. Supp. 3d at 1219.  Also in *Johnson v. Yahoo!, Inc.*, No. 14

18   CV 2028, 14 CV 2752, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014), the Court

19   refused to find "human intervention" existed where there was some evidence a computer

20   software program  could "pull numbers and dial them without a person ordering a specific

21   system message."  Here, Brickman has alleged Facebook's dialing system can do exactly

22   that.

23       2. **The Court Need Not Address Whether Brickman Granted Facebook Consent**

24          **at the Motion to Dismiss Stage**

25          While Facebook suggests that Brickman provided prior express consent to receive

26   the text message from it, Brickman has continuously alleged that at all relevant times he

27   indicated in the Notification Settings of his Facebook account that he did *not* consent to

28   receive any text messages from Facebook, including the Birthday Announcement Texts.

8

1    FAC ¶¶ 2, 36, 79–82, 85.  For purposes of this motion, the Court must "accept all material

2    allegations of fact as true and construe the complaint in a light most favorable to the non-

3    moving party."  *Vasquez*, 487 F.3d at 1249.  Accordingly, while the issue may be disputed

4    at a later time, the Court shall accept as true Brickman's allegation that he did not provide

5    consent to receive text messages from Facebook.

6        3. **Constitutionality of the TCPA under the First Amendment**

7        Because the Court finds that Brickman's allegations are sufficient to state a claim

8    under the TCPA, Facebook challenges the constitutionality of the TCPA under the First

9    Amendment both as-applied and on its face.  Mot. at 17.  Because invalidating the TCPA

10   would release Facebook from potential liability and therefore redress its injuries, Facebook

11   has standing to challenge the constitutionality of the TCPA.  *McCormack v. Herzog*, 788

12   F.3d 1017, 1026 (9th Cir. 2015) (in order to challenge a statute, a plaintiff must show a

13   realistic danger of sustaining a direct injury as a result of the statute's enforcement).   The

14   Court shall first address the facial challenge, and then the as-applied challenge.

15       a. **Facebook's Facial Challenge**

16       Facebook argues the recent Supreme Court decision in *Reed v. Gilbert,* 135 S. Ct.

17   2218 (2015), requires that the TCPA be subject to strict scrutiny.  In *Reed*, the Court was

18   analyzing the constitutionality of a town's comprehensive sign code ("Sign Code") that

19   prohibited the display of outdoor signs without a permit, but exempted twenty-three

20   categories of signs including ideological signs, political signs, and temporary directional

21   signs.  *Id.* at 2224.  The scheme provided different regulations for different categories of

22   signs.  For example, ideological signs which were defined as signs "communicating a

23   message or ideas" that did not fit in any other Sign Code category, could be up to twenty

24   square feet and had no placement or time restrictions.  *Id.*  At the same time, "political

25   signs," which were defined as signs "designed to influence the outcome of an election,"

26   could be up to thirty-two square feet and could only be displayed during an election

27   season; and "Temporary Directional signs," defined as "signs directing the public to a

28   church or other 'qualifying event,'" had to be limited to four signs or less, were limited to

9

United States District Court
Northern District of California

1    six square feet, and could not be displayed more than twelve hours before the 'qualifying

2    event' or beyond one hour after the event. *Id.*at 2224–25.

3         In analyzing the constitutionality of the Sign Code, the Court explained that courts

4    must first determine whether the law is content neutral on its face. *Id.* at 2228.  The Court

5    further explained that "[a] law that is content based on its face is subject to strict scrutiny

6    regardless of the government's benign motive, content-neutral justification, or lack of

7    'animus toward the ideas contained' in the regulated speech." *Id.* A government regulation

8    of speech is content-based "if [the] law applies to particular speech because of the topic

9    discussed or the idea or message expressed." *Id.* at 2227.  The Court then applied this

10   framework to the Sign Code and found it to be content-based because the restrictions that

11   applied to any given sign "depend[ed] entirely on the communicative content of the sign."

12   *Id.* at 2227.  Therefore, the Sign Code was subject to strict scrutiny and, to survive, the

13   town was required to prove the restriction furthered a compelling interest and that it was

14   narrowly tailored to achieve that interest. *Id.* at 2231.

15        The town claimed that the Sign Code furthered the compelling interests of

16   preserving the Town's aesthetic appeal and promoting traffic safety. *Id.*  Yet, even while

17   assuming these were compelling governmental interests, the Court found the Sign Code

18   failed strict scrutiny because it was "hopelessly underinclusive." *Id.*  Specifically, the

19   Court found that temporary direction signs were "no greater an eyesore" than ideological

20   or political ones; that the code allowed "unlimited proliferation" of large ideological signs

21   while strictly limiting the number, size, and duration of smaller ones; and that the town

22   offered no reason to believe that directional signs posed a greater threat to traffic safety

23   than ideological or political signs. *Id.* at 2231–32.  In light of this underclusiveness, the

24   Court struck the Sign Code down because "a law cannot be regarded as protecting an

25   interest of the highest order, and thus as justifying a restriction on truthful speech, when it

26   leaves appreciable damages to that supposedly vital interest prohibited." *Id.* at 2232

27   (quoting *Republican Party of Minn. v. White*, 536 U.S. 965, 780 (2002)).

28        Applying *Reed* to the TCPA, Facebook argues the TCPA is content-based because

United States District Court
Northern District of California

10

1    "it's riddled with exceptions that 'draw[] distinctions based on the message a speaker

2    conveys." Mot. at 19:1–3.  In particular, Facebook points to three provisions in the TCPA:

3    (1) an exemption applying to any "call made for emergency purposes" (47 U.S.C. §

4    227(b)(1)(A)); (2) an exemption applying to any call "made solely to collect a debt owed

5    to or guaranteed by the United States (*Id.* at  § 227(b)(1)(A)(iii)); and (3) a section

6    empowering the FCC to exempt calls made with an ATDS to a cell phone number if the

7    calls "are not charged to the called party" and are "in the interest of the privacy rights [the

8    TCPA] is intended to protect" (*Id.* at  § 227(b)(2)(C)).  Mot. at 19–20.

9         This Court agrees that the first two exceptions are content-based and therefore

10   subject to strict scrutiny.  Certainly, each of these exceptions would require a court to

11   examine the content of the message that is conveyed in order to determine if a violation of

12   the TCPA has occurred.  Brickman's and the government's arguments to the contrary are

13   not persuasive.  First, Brickman argues the TCPA's emergency exemption is content-

14   neutral because whether a call or text falls within the exception depends on the *situation*

15   rather than the content of the message.  ECF No. 55 ("Opp'n"), at 11:20–26.  But such an

16   interpretation would lead to puzzling results as it would mean that any message sent during

17   a natural disaster or power outage would fall within the emergency exception, regardless of

18   whether the message conveyed safety information, an advertisement, or a joke.  This also

19   runs counter to the statutory definition which defines emergency purposes as "calls made

20   necessary in any situation affecting the health and safety of consumers."  47 C.F.R. §

21   64.1200(f)(4).  Whether a call is "necessary" in a situation affecting the health and safety

22   of consumers would depend on the content of the call, not just whether an emergency

23   situation exists.

24        Second, Brickman argues the debt-collection exception is also content-neutral

25   because the "exception is based on the called party's debtor-creditor relationship with the

26   government, not on the content of the message."  Opp'n at 12:1–4.  This too is

27   unconvincing.  The plain language of the exception makes no reference whatsoever to the

28   relationship of the parties.  Rather the exception applies to all calls made to collect debt

United States District Court
Northern District of California

11

1    owed or guaranteed by the United States.  Brickman's and the government's cited

2    authorities in support of this "relationship" argument are inapposite.  In both *Van Bergen v.*

3    *Minnesota*, 59 F.3d 1541 (8th Cir. 1995), where the court found a Minnesota statute

4    regulating the use of automatic dialing-announcing devices to be content-neutral, and

5    *Patriotic Veterans, Inc. v. Zoeller*, No. 16-2059, 2017 WL 25482 (7th Cir. 2017), where

6    the court found Indiana's Automated Dialing Machine Statute to be content-neutral, the

7    statutes at issue expressly exempted calls from regulation based on a caller's *relationship*

8    to the recipient, not content.

9           The third exemption, however, is not a content-based restriction.  During oral

10   arguments, Facebook clarified it is not challenging any exceptions made under the FCC's

11   authority, nor is it arguing that the FCC has taken actions that are not consistent with the

12   statute.  Instead, Facebook is challenging the FCC's authority to create exemptions to the

13   TCPA because, Facebook argues, such authority "plainly calls for the scrutiny of the

14   content of the message to determine whether it is consistent with the government's views

15   on privacy."  ECF No. 64 ("Reply") at 15:17–18. This argument is unavailing.  Although

16   the statute empowers the FCC to create exceptions that promote the interest of privacy

17   rights, there are content-neutral ways for the FCC to accomplish this.  Indeed, like the

18   statutes at issue in *Van Bergen*, 59 F.3d at 1545 n. 2, or *Patriotic Veterans*, 2017 WL

19   25482, at *1, the FCC could create exceptions based on a party's relationship.  The mere

20   possibility that the FCC could create a content-based exception at some later time does not

21   render this exception to be content-based itself.

22          In sum, this Court finds the emergency and government-debt exceptions to the

23   TCPA to be content-based.  Accordingly, *Reed* requires that the TCPA and the first two

24   exemptions be subject to strict scrutiny.  *See Reed*, 135 S. Ct. at 2228.

### i.  **The TCPA Withstands Strict Scrutiny**

26          In order to survive strict scrutiny, "the government [must] prove that the restriction

27   furthers a compelling interest and is narrowly tailored to achieve that interest."  *Reed*, 135

28   S. Ct. at 2231.  While strict scrutiny is a difficult standard to meet, the Supreme Court has

United States District Court
Northern District of California

1    sought to dispel the notion that strict scrutiny is "strict in theory, but fatal in fact."

2    Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1666 (2015) (citation omitted).  Here, the

3    Court finds the TCPA survives strict scrutiny.

4                            1.  **The TCPA Serves a Compelling Interest**

5            The government devoted several pages supporting its claim that there is a

6    compelling government interest in protecting residential privacy.  ECF No. 63 ("U.S.

7    Opp'n") at 17–19.  Specifically, the government provided several Congressional records

8    stating, *inter alia*, that the TCPA was enacted "to protect the privacy interests of residential

9    telephone subscribers;" that Congress determined automated telephone calls to be "an

10   invasion to privacy, an impediment to interstate commerce, and a disruption to essential

11   public safety services;" and that Congress determined that enacting the TCPA was "the

12   only effective means of protecting telephone consumers from this nuisance and privacy

13   invasion."  U.S. Opp'n at 18.  Facebook assumes for purposes of this motion that

14   promoting privacy is a compelling state interest.  Reply at 22:20–21.

15           The Supreme Court has frequently emphasized that "[t]he State's interest in

16   protecting the well-being, tranquility, and privacy of the home is certainly of the highest

17   order in a free and civilized society."  *Carey v. Brown*, 447 U.S. 455, 471 (1980); *Frisby v.*

18   *Schultz*, 487 U.S. 474, 484 (1988) (same); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S.

19   753, 775 (1994) (same); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (same).

20   *See also Carey*, 447 U.S. at 471 ("Preserving the sanctity of the home, the one retreat to

21   which men and women can repair to escape from the tribulations of their daily pursuits, is

22   surely an important value.").  Further, the Court has recognized that the interest in

23   residential privacy applies with greater force when individuals seek protection from

24   unwanted speech and has explicitly recognized the Government's ability to protect this

25   freedom:

26                   One important aspect of residential privacy is protection of the
                     unwilling listener.  Although in many locations, we expect
27                   individuals simply to avoid speech they do not want to hear,
                     [citations], the home is different. . . . [A] special benefit of the
28                   privacy all citizens enjoy within their own walls, which the

*United States District Court*
*Northern District of California*

13

United States District Court
Northern District of California

1

2

> State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

3    *Frisby*, 487 U.S. at 484–85 (citations omitted).  In accordance with this legal authority, and

4    because neither party contests the matter, the Court holds the TCPA serves a compelling

5    government interest in promoting residential privacy.

6                    2.  **The TCPA is Narrowly Tailored**

7         Despite assuming the TCPA serves a compelling interest, Facebook argues the

8    TCPA still cannot survive strict scrutiny because the TCPA is both underinclusive and

9    overinclusive, and because there are less restrictive means of achieving the compelling

10   interest.  ECF No. 72 ("FB Supp.") at 1:7–12.  The Court addresses each point in turn.

11                    a.  **The TCPA is Not Underinclusive**

12        The Supreme Court has recognized that while "underinclusivity raises a red flag,

13   the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-*

14   *Yulee,* 135 S. Ct. at 1668.  After all, "[i]t is always somewhat counterintuitive to argue that

15   a law violates the First Amendment by abridging *too little* speech." *Id*. (emphasis in

16   original).  Yet, underinclusiveness of a statute can raise doubts as to whether the

17   government is pursuing an interest it invokes or whether the statute furthers a compelling

18   interest. *Id.*  Because "[a] State need not address all aspects of a problem in one fell

19   swoop," the Supreme Court has "upheld laws – even under strict scrutiny – that

20   conceivably could have restricted even greater amounts of speech in service of their stated

21   interests." *Williams-Yulee v. Florida* Bar, 135 S. Ct. 1656, 1668 (2015).

22        Facebook argues that TCPA's speech restrictions are "hopelessly underinclusive"

23   under *Reed* because texts about emergencies or government debt are no less intrusive to

24   privacy than other types of calls.  Mot. at 21.  However, the Sign Code in *Reed* is

25   distinguishable from this case.  First, in *Reed* the Court was addressing a Sign Code that

26   sought to preserve the aesthetics of the town and to promote traffic safety by prohibiting

27   outdoor signs without a permit.  Yet the ordinance itself provided twenty-three exceptions.

28   Here, in contrast, the TCPA is not "riddled with exceptions" as it only contains only two

14

1    exceptions, with the possibility for the FCC to set other exceptions in the future.[2]

2    Second, unlike the Sign Code in *Reed* which allowed "unlimited proliferation" of

3    one type of sign while strictly limiting a different type of sign, here, neither exception

4    allows for unlimited proliferation of any type of call.  Emergency calls by their statutory

5    definition would only be allowed under limited circumstances, for a limited time, and for

6    limited purposes.[3]  Moreover, Congress determined that banning such automated or

7    prerecorded telephone calls to the home, except when the receiving party consents to

8    receiving the call or when such calls are necessary in an emergency situation affecting the

9    health and safety of the consume, is *the only effective means* of protecting telephone

10   consumers from the nuisance and privacy invasion."  Telephone Consumer Protection Act

11   of 1991, Pub. L. No. 102-243, § 2(12), 105 Stat. 2394 (1991) (emphasis added).  In other

12   words, Congress carefully balanced the interests in the health and safety of consumers with

13   the interests in protecting privacy and determined the emergency call exception was

14   carefully tailored to address both interests.

15   The government debt exception would likewise be limited by the fact that such calls

16   would only be made to those who owe a debt to the federal government.  On a related note,

17   the Supreme Court has recognized that the "United States and its agencies . . . are not

18   subject to the TCPA's prohibitions because no statute lifts their immunity."  *Campbell-*

19   *Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016).  In other words, the government-debt

20   exception to the TCPA does not present a First Amendment problem because it merely

21   carves out an exception for something the federal government is already entitled to do, and

22   government speech is exempt from First Amendment scrutiny.  *Pleasant Grove City, Utah*

23   *v. Summum*, 555 U.S. 460, 467–68 (2009) (The government's own speech is exempt from

24   First Amendment scrutiny); s*ee also Delano Farms Co. v. Cal. Table Grape Com'n*, 586

25

26   [2] As stated above, Facebook has stated it is not contesting any exemptions created under the FCC's authority to create exemptions under 47 U.S.C. § 227 (b)(2)(C).  *See supra*
Section III.3.a.

27   [3] Notably, in *Reed*, 135 S. Ct. at 2232, the Court recognized that a speech regulation

28   narrowly tailored to address the challenges of protecting safety "well might survive strict scrutiny."

1    F.3d 1219, 1220 (9th Cir. 2009) ("government speech [] is immune to challenge under the

2    First Amendment").  And even assuming this newly-added exception[4] were to be invalid, it

3    would not deem the entire TCPA to be unconstitutional because the exception would be

4    severable from the remainder of the statute.  *See INS v. Chadha*, 462 U.S. 919, 931–32

5    (1983) ("invalid portions of a statute are to be severed unless it is evident that the

6    Legislature would not have enacted those provisions which are within its power,

7    independently of that which is not.")

8           Indeed, the *Reed* court stated that a law cannot justify a restriction on speech in the

9    name of a vital interest, "when it leaves *appreciable* damage to that supposedly vital

10   interest unprohibited."  *Reed,* 135 S. Ct. at 2232.  Here, the TCPA's exemptions leave

11   negligible damage to the statutes interest in protecting privacy.  In sum, the Court finds the

12   exceptions to the TCPA are narrow and not underinclusive to the degree it is "hopeless",

13   nor to the degree that it allows "unlimited proliferation" of privacy intrusions, nor to the

14   degree that it leaves "appreciable damage" to its vital interest in protecting residential

15   privacy.

b.   **The TCPA is Not Overinclusive**

17          Facebook also argues the TCPA is overinclusive because "in purporting to target

18   the ill of unwanted telemarketing it sweeps in speech that facilitates social connections."

19   FB Supp. at 3:16–18.  In support of this argument, Facebook cites to congressional

20   findings in support of the TCPA where Congress repeatedly identified telemarketing as a

21   threat to privacy.  *See* Telephone Consumer Protection Act § 2.  But the TCPA is quite

22   limited in what it prohibits.  It only restricts calls made *using an ATDS without the prior*

23   *express consent* of the recipient.  *See* 47 U.S.C. § 227(b)(1)(a).  In other words, the TCPA

24   does not restrict individuals from receiving any content they want to receive – speech that

25   would otherwise be prohibited by the TCPA is immediately removed from the purview of

26   the statute once express consent is provided.  If individuals want to receive speech from

27

28   ---
     [4] The government-debt exception was added to the TCPA in 2015.  *See* Bipartisan Budget
     Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (2015)

United States District Court
Northern District of California

1    Facebook that facilitates social connections, they are not prohibited from doing so.

2    Accordingly, this Court finds the TCPA is not overinclusive.

3                    3.  **Facebook's Suggested Alternatives Are Not Effective**

4           Lastly, Facebook argues that the TCPA is not narrowly tailored because there are

5    less restrictive alternatives that can regulate robocalls.  FB Supp. at 4:15–22.  The Supreme

6    Court has explained that "[l]ess restrictive alternatives must be *at least as effective* in

7    achieving the legitimate purpose that statute was enacted to serve."  *Reno v. Am. Civil*

8    *Liberties Union*, 521 U.S. 844, 874 (1997).  Facebook suggests that two other courts have

9    already recognized less restrictive alternatives for "protecting residential privacy and

10   tranquility from unwanted and intrusive robocalls."  Mot. at 22.  Specifically, Facebook

11   points to *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015), where the court found

12   plausible alternatives to include time-of-day limitations, mandatory disclosure of the

13   caller's identity, and do-not-call lists.  But in *Cahaly*, the court only found these

14   alternatives to be plausible because the "government [] offered no evidence showing that

15   these alternatives would not be effective in achieving its interest."  *Id.*  Facebook also

16   points to *Gresham v. Rutledge*, No. 4:16CV00241 JLH, 2016 WL 4027901, at \*4 and nn.

17   17–19 (E.D. Ark. July 27, 2016), where the Court recognized plausible less restrictive

18   alternatives to include time-of-day limitations, disconnection requirements, and

19   prohibitions on calls to emergency lines.  *Id*.  But similar to *Cahaly*, the government in

20   *Gresham* did not contest these three alternatives and "therefore fail[ed] to demonstrate that

21   no less restrictive alternative [was] available."  *Id.*

22          Here, in contrast to the defendants in *Cahaly* and *Gresham*, the Government is

23   contesting the validity of Facebook's proposed alternatives.  And this Court agrees that

24   Facebook's proposals would not "be at least as effective" as the TCPA in achieving

25   residential privacy.  Time-of-day limitations would not achieve the same privacy

26   objectives because even though such a restriction may designate the span of time in which

27   callers can intrude on an individual's privacy, it would also designate a time for intrusive

28   phone calls.  Mandatory disclosure of a caller's identity and disconnection requirements

United States District Court
Northern District of California

17

1    would also not be as effective in achieving residential privacy because these would not

2    prevent the privacy intrusion from the phone call in the first place.  Do-not-call lists would

3    also not be a plausible less restrictive alternative because placing the burden on consumers

4    to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not

5    be as effective in achieving residential privacy.  Lastly, a prohibition on calls to emergency

6    lines is already incorporated into the TCPA at § 227(b)(1)(a)(i).

7         Facebook also briefly suggested in its supplemental brief and during oral arguments

8    that the TCPA could be more narrowly tailored by pointing to §§ 227(b)(1)(B) and §

9    227(b)(1)(C) which Facebook claims exempt noncommercial calls on residential and fax

10   lines from TCPA restrictions.  FB Supp. at 5:5–7.  But under Facebook's own analysis,

11   such restrictions would also be content-based and subject to strict scrutiny.

12        In sum, the Court finds Facebook has presented no plausible less restrictive

13   alternative that would at least be as effective in protecting privacy as the TCPA.

14                    b.  **Facebook's As-Applied Challenge Fails**

15        Because Facebook's facial challenge fails, so too does its as-applied challenge.  The

16   Court need not, and does not, undergo this analysis because even assuming Facebook's

17   text message was not commercial speech, the TCPA withstands strict scrutiny.

18   Accordingly, Facebook's as-applied challenge fails.

19   **IV. CONCLUSION**

20        For the reasons articulated above, the Court finds Brickman has sufficiently alleged

21   a violation of the TCPA and that the TCPA is constitutional.  Accordingly Facebook's

22   Motion to Dismiss is DENIED.

23

24   **IT IS SO ORDERED.**

25

26   Dated: 1/27/17                    _____

27                                     THELTON E. HENDERSON
                                       United States District Judge

28